## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

AARON ECKERT,
     *Plaintiff,*

     v.                             No. 3:19-cv-982 (VAB)

DANIEL GRADY, *et al.*,
     *Defendants.*

### INITIAL REVIEW ORDER

Aaron Eckert ("Plaintiff"), currently confined at Cheshire Correctional Institution, has

filed an amended civil rights Complaint *pro se* under 42 U.S.C. § 1983 against

Supervisor/Security Risk Group Coordinator John Aldi ( "SRG Coordinator Aldi"), Lieutenant

Daniel Papoosha, Commissioner Scott Semple, Director of Security Antonio Santiago, Office of

Classification and Population Management Director Dave Miaga ("OCPM Director Miaga"),

Correctional Officer Daniel Grady, Lieutenant Richardson, Warden Allison Black, Warden

Corcella, and Correctional Officer Martin Martins. *See* Am. Compl., ECF No. 17, at 1, 4–6 (Nov.

8, 2019).

For the reasons set forth below, the Amended Complaint will be **DISMISSED in part**.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

### A.  FACTUAL ALLEGATIONS

On September 16, 2016, the State of Connecticut's Department of Correction (the

"Department of Correction") allegedly assigned Mr. Eckert, a pretrial detainee on charges of

criminal trespass and assault in the third degree, to Bridgeport Correctional Center in Unit 37A.

Am. Compl. at 6 ¶ 23. The Department of Correction allegedly permitted Mr. Eckert to have ten

hours of out-of-cell recreation each day. During recreation, Mr. Eckert allegedly could make up

to six telephone calls, take a shower, and use available exercise equipment. *Id.* at 6–7 ¶ 24. Mr. Eckert allegedly also could receive visitors, both family members and friends, five times each week. *Id.*

On October 31, 2016, Mr. Eckert pleaded guilty to one count of assault in the third degree in *State v. Eckert*, Docket No. D03D-CR16-0154085-S, and two counts of larceny in the sixth degree in *State v. Eckert*, Docket No. D03D-CR16-0153962-S. *Id.* On November 10, 2016, a judge sentenced Mr. Eckert to a year of imprisonment, execution suspended after ninety days and two years of probation in *State v. Eckert*, Docket No. D03D-CR16-0154085-S, and ninety days of imprisonment on both counts of larceny in the sixth degree in *State v. Eckert*, Docket No. D03D-CR16-0153962-S.[1]

On November 16, 2016, correctional officers allegedly escorted Mr. Eckert from his cell in Unit 37A to the admitting and processing area to be transferred to MacDougall-Walker Correctional Institution ("MacDougall-Walker"). *Id.* at 7 ¶ 25. As he waited to be transferred, Correctional Officer Grady allegedly asked Mr. Eckert about the existence of gangs operating in Unit 37A and whether he had observed any drug activity in the unit. *Id.* "After an exchange of derogatory remarks directed at Defendant[s] Papoosha and Brady," correctional staff allegedly placed Mr. Eckert back in a holding cell. *Id.*; Ex. C, ECF No. 18 (Mar. 13, 2020). The Department of Correction transferred Mr. Eckert to MacDougall-Walker later that day. *Id.*

On November 21, 2016, Officer Grady allegedly issued Mr. Eckert a disciplinary ticket, charging him with affiliating with the Bloods, a Security Risk Group (or "SRG"), based on

---

[1] Information pertaining to these convictions and sentences may be found on the State of Connecticut Judicial Branch. Superior Court Case Look-up, STATE OF CONNECTICUT JUDICIAL BRANCH, http://www.jud.ct.gov/jud2.htm (follow the Criminal/Motor Vehicle hyperlink under the Superior Court Case Look-up hyperlink; then search using the relevant docket numbers—D03D-CR16-0154085-S and D03D-CR16-0153962-S).

2

conduct and statements made in the admitting and processing area at Bridgeport Correctional Center. Am. Compl. at 7 ¶ 26; Ex. A, ECF No. 13. Prison officials at MacDougall placed Mr. Eckert in a cell in the restrictive housing unit pending the disposition of the disciplinary report. Am. Compl. at 7 ¶ 26.

On December 9, 2016, Mr. Eckert allegedly participated in a disciplinary hearing regarding the Security Risk Group affiliation charge. *Id.* at 7 ¶ 28. Lieutenant Richardson allegedly presided over the hearing and read the allegations that constituted the basis of the disciplinary charge. *Id.* at 7–8 ¶ 29. Mr. Eckert allegedly refuted all of the allegations made against him. *Id.* at 8 ¶ 33. Lieutenant Richardson allegedly found Mr. Eckert guilty of the charge, based on documentation submitted, including information provided by a confidential source. *Id.* Lieutenant Richardson did not reveal the information from the confidential source to Mr. Eckert. *Id.* at 8–9 ¶¶ 34–35. Lieutenant Richardson allegedly imposed sanctions of sixty days loss of phone and mail privileges and fifteen days loss of Risk Reduction Earned Credit. *Id.* at 9 ¶ 36.

On December 27, 2016, prison officials at MacDougall-Walker allegedly transferred Mr. Eckert to Corrigan-Radgowski Correctional Institution ("Corrigan") to begin Phase 3 of the Security Risk Group Program. *Id.* at 9 ¶¶ 37–39. In Phase 3, the Department of Correction allegedly limited Mr. Eckert to three fifteen-minute telephone calls a day; two fifteen-minute telephone calls with his attorney or the court per day; a one-hour visit from a family member each week; five pieces of mail in his cell at one time; one haircut each month; one hour of recreation each day; and confinement in his cell twenty-three hours each day. *Id.* 9 ¶ 40. Mr. Eckert allegedly wrote to Security Risk Group Coordinator Aldi to contest his designation as a member of a Security Risk Group. *Id.* at 10 ¶ 41. Security Risk Group Coordinator Aldi

3

allegedly did not respond to Mr. Eckert's letter. *Id.* at 10 ¶ 42. On January 20, 2017, Mr. Eckert completed his prison sentence. *Id.* at 10 ¶ 44.

On December 19, 2017, the Department of Correction assigned Mr. Eckert, once again a pretrial detainee, to Bridgeport Correctional Center, after his arrest on new criminal charges. *Id.* at 10 ¶ 45. A correctional officer allegedly placed him in a cell in the restrictive housing unit because of his previous designation as a member of a Security Risk Group. *Id.* 10 ¶ 46. On January 11, 2018,[2] twenty-three days after his placement in the restrictive housing unit, prison officials at Bridgeport Correctional Center allegedly transferred Mr. Eckert to Corrigan. *Id.* ¶ 47. Mr. Eckert never received a disciplinary report, a hearing, or a meeting regarding his immediate placement in the restrictive housing unit at Bridgeport Correctional Center or his transfer to Corrigan. *Id.* at 10–11 ¶¶ 46, 48.

On March 14, 2018, a judge released Mr. Eckert from imprisonment after a court proceeding. *Id.* at 11 ¶ 49.

On January 22, 2019, the Department of Correction sent Mr. Eckert back to Bridgeport Correctional Center as a pretrial detainee. *Id.*; Mot. Amend, ECF No. 8, at 3 ¶ 2.[3]  Prison officials placed Mr. Eckert in the restrictive housing unit and then subsequently transferred him to Corrigan to Phase 3 of the Security Risk Group Program. *Id.* He allegedly had to eat all his meals in his cell and endured cell searches when other members of his alleged Security Risk

---

[2] Mr. Eckert lists the date of his transfer as November 11, 2017. *Id.* at 11 ¶ 47. It is apparent this date is inaccurate given the fact that Mr. Eckert alleges that prison officials transferred him twenty-three days after his readmission to the Department of Correction on December 19, 2017. *Id.* ¶ 45. Thus, the Court construes the date of his transfer as having occurred on January 11, 2018.

[3] Department of Correction records reflect that Mr. Eckert's most recent date of admission was January 22, 2019. This information may be found at http://portal.ct.gov/DOC using Mr. Eckert's Connecticut Department of Correction Inmate Number - 351649.

Group engaged in improper conduct. *Id.* at 11 ¶ 50.

On October 13, 2019, Mr. Eckert allegedly wrote to Warden Santiago about his allegedly improper designation as a Security Risk Group member and the resulting restrictive conditions. *Id.* at 12 ¶ 57.[4]

On April 2, 2019, Mr. Eckert received his sentence for this most recent criminal conviction. *Id.* at 13 ¶ 58. On October 13, 2019, Mr. Eckert allegedly wrote to Director Santiago regarding his allegedly improper designation as a Security Risk Group member and the resulting restrictive conditions at Corrigan. *Id.* ¶ 56. At some point after April 2, 2019, Mr. Eckert's cellmate, allegedly a member of the Aryan Brotherhood, allegedly assaulted him because of his affiliation with the Bloods. *Id.* at 14 ¶ 58.

### B. PROCEDURAL HISTORY

On June 24, 2019, Mr. Eckert filed a Complaint and a motion to proceed *in forma pauperis*. Compl., ECF No. 1 (June 24, 2019); Mot., ECF No. 2 (June 24, 2019).

On June 28, 2019, the motion to proceed *in forma pauperis* was granted. Order, ECF No. 6 (June 28, 2019).

On October 4, 2019, Mr. Eckert filed a motion to amend his Complaint. Mot., ECF No. 8 (Oct. 4, 2019).

On November 8, 2019, Mr. Eckert filed a second motion to amend his Complaint and an Amended Complaint. Second Mot. to Amend, ECF No. 9 (Nov. 8, 2019); Am. Compl., ECF No. 17 (Nov. 8, 2019).

On February 7, 2020, Mr. Eckert filed exhibits to his Amended Complaint. Exs., ECF No. 13 (Feb. 7, 2020).

On February 27, 2020, the Court granted his second motion to amend and found his first motion to amend moot. Order, ECF No. 15 (Feb. 27, 2020).

On March 4 and 13, 2020, Mr. Eckert filed further exhibits to his Amended Complaint. Ex., ECF No. 16 (Mar. 4, 2020); Ex., ECF No. 18 (Mar. 13, 2020).

## II. STANDARD

Under 28 U.S.C. § 1915A(b), district courts must review prisoners' civil complaints against governmental actors and *sua sponte* "dismiss . . . any portion of [a] complaint [that] is frivolous, malicious, or fails to state a claim upon which relief may be granted," or that "seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b); *see also Liner v. Goord*, 196 F.3d 132, 134 & n.1 (2d Cir. 1999) (explaining that, under the Prisoner Litigation Reform Act, *sua sponte* dismissal of frivolous prisoner complaints is mandatory); *Tapia-Ortiz v. Winter*, 185 F.3d 8, 11 (2d Cir. 1999) ("Section 1915A requires that a district court screen a civil complaint brought by a prisoner against a governmental entity or its agents and dismiss the complaint *sua sponte* if, *inter alia,* the complaint is 'frivolous, malicious, or fails to state a claim upon which relief may be granted.'") (quoting 28 U.S.C. § 1915A).

Rule 8 of the Federal Rules of Civil Procedure requires that a plaintiff plead only "a short and plain statement of the claim showing that the pleader is entitled to relief," *see* Fed. R. Civ. P. 8(a)(2), to provide the defendant "fair notice of what the . . . claim is and the grounds upon which it rests," *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

A plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level" and assert a cause of action with enough heft to show entitlement to relief and "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 555,

---

[4] He also allegedly wrote to Commissioner Semple on November 5, 2016. Am. Compl. at 12 ¶ 56.

570. A claim is facially plausible if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Although the Federal Rules of Civil Procedure do not require "detailed factual allegations," a complaint must offer more than "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement." *Twombly*, 550 U.S. at 555–57. Plausibility at the pleading stage is nonetheless distinct from probability, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the claim] is improbable, and . . . recovery is very remote and unlikely." *Id.* at 556 (internal quotation marks omitted).

Complaints filed by *pro se* plaintiffs, however, "must be construed liberally and interpreted to raise the strongest arguments that they suggest." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F. 3d 471, 474 (2d Cir. 2006)) (internal quotation marks omitted); *see also Tracy v. Freshwater*, 623 F. 3d 90, 101–02 (2d Cir. 2010) (discussing the "special solicitude" courts afford pro se litigants).

**III. DISCUSSION**

Mr. Eckert asserts several claims for each period of incarceration. He brings a First Amendment claim against Security Risk Group Coordinator Aldi, Security Director Santiago and Officers Martins and Grady, and a Fourteenth Amendment procedural due process claim against Officers Martins and Grady and Lieutenant Richardson in connection with the issuance of the disciplinary report for Security Risk Group affiliation and the subsequent hearing in 2016.

He brings an additional Fourteenth Amendment procedural and substantive due process

claim against Security Risk Group Coordinator Aldi, Lieutenant Papoosha, Commissioner Semple, Director of Security Santiago, OCPM Director Miaga and Wardens Black and Corcella in connection with his automatic placement in the Security Risk Group Program after his readmission to the Department of Correction in December 2017 and after his readmission to the Department of Correction in January 2019.

He also brings an Eighth Amendment claim against SRG Coordinator Aldi, Lieutenant Papoosha, Commissioner Semple, OCPM Director Miaga and Warden Corcella in connection with his incarceration after his sentencing in April 2019. Lastly, he also asserts a state law claim of intentional infliction of emotional distress.[5]

Mr. Eckert seeks general, special, actual, punitive, and compensatory damages and a declaratory judgment that all Defendants violated his federal constitutional rights. He seeks an injunction directing the Defendants to refrain from "engaging in the unlawful practices described" in the Amended Complaint and an injunction directing the Defendants to remove him from the Security Risk Group Program and to transfer him to general population, to expunge his disciplinary report for Security Risk Group affiliation, and to restore lost Risk Reduction Earned Credit due to his designation as a Security Risk Group member. Am. Compl. at 19–20.

### A.     The Eleventh Amendment's Impact on Claims for Damages and Declaratory Relief

Under the doctrine of *Ex parte Young,* 209 U.S. 123 (1908), a plaintiff may seek

---

[5] The Court limits its review for purposes of 28 U.S.C. § 1915A to Mr. Eckert's federal law claims. The core purpose of an initial review order is to determine whether the lawsuit may proceed at all in federal court and should be served upon any of the named Defendants. If there are no facially plausible federal law claims against any of the named Defendants, then the Court would decline to exercise supplemental jurisdiction over any state law claims under 28 U.S.C. § 1367. *See, e.g.*, *Nicholson v. Lenczewski*, 356 F. Supp. 2d 165-66 (D. Conn. 2005). If there are viable federal law claims, then the validity of any accompanying state law claims may be appropriately addressed by the filing of a motion to dismiss or a motion for summary judgment later in the case. More generally, an initial review order under 28 U.S.C. § 1915A is without prejudice to the right of any Defendant to seek dismissal of any

prospective injunctive and declaratory relief to address an ongoing or continuing violation of federal law or a threat of a violation of federal law in the future. *See In re Deposit Ins. Agency,* 482 F.3d 612, 618 (2d Cir. 2007); *Ward v. Thomas*, 207 F.3d 114, 120 (2d Cir. 2000). Monetary relief from a defendant in his or her official capacity is barred by the Eleventh Amendment. *See Kentucky v. Graham*, 473 U.S. 159 (1985) (Eleventh Amendment, which protects the state from suits for monetary relief, also protects state officials sued for damages in their official capacity); *Quern v. Jordan*, 440 U.S. 332, 342 (1979) (Section 1983 does not override a state's Eleventh Amendment immunity).

Mr. Eckert's request for a declaration that the Defendants violated his First, Eighth, and Fourteenth Amendment rights in the past is barred by the Eleventh Amendment. *See Puerto Rico Aqueduct and Sewer Authority v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993) (the Eleventh Amendment "does not permit judgments against state officers declaring that they violated federal law in the past"); *Green v. Mansour*, 474 U.S. 64, 68 (1985) ("We have refused to extend the reasoning of *Young* . . . to claims for retrospective relief") (citations omitted). Furthermore, if Mr. Eckert were to prevail on either his First, Eighth, or Fourteenth Amendment claims, the Court necessarily would determine that the Defendants had violated his constitutional rights. Thus, a separate award of declaratory relief is unnecessary.

Accordingly, both the requests seeking general, special, actual, punitive and compensatory damages for violations of Mr. Eckert's federal constitutional rights by the Defendants in their official capacities and Mr. Eckert's request for a declaratory judgment are dismissed under 28 U.S.C. § 1915A(b)(2).

**B.    The First Amendment Claim**

---

claims by filing a motion to dismiss or motion for summary judgment.

Prison officials may not retaliate against inmates for exercising their constitutional rights. Thus, when prison officials take adverse action against an inmate, motivated by the inmate's exercise of a protected constitutional right, a Section 1983 retaliation claim may be brought. *See Friedl v. City of N.Y.*, 210 F.3d 79, 85 (2d Cir. 2000) ("In general, a section 1983 claim will lie where the government takes negative action against an individual because of his exercise of rights guaranteed by the Constitution or federal laws.").

To state a claim for First Amendment retaliation, a plaintiff must allege facts showing "(1) that the speech or conduct at issue was protected, (2) that the defendant took an adverse action against [him or her], and (3) that there was a causal connection between the protected speech [or conduct] and the adverse action." *Dolan v. Connolly*, 794 F.3d 290, 294 (2d Cir. 2015) (internal quotation marks and citation omitted). To establish the causal connection, the protected activity, conduct, or speech must have been a substantial motivating factor for the "adverse actions" taken against the inmate by the defendant. *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003). The Second Circuit has "instructed district courts to approach prisoner retaliation claims with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act." *Dolan*, 794 F.3d at 295 (internal quotation marks and citation omitted).

Mr. Eckert alleges that Officers Grady and Martins issued him a false disciplinary ticket for Security Risk Group affiliation in retaliation after his argument with Officer Grady about a tattoo on his forearm. Mr. Eckert then allegedly insulted Officers Grady and Martins and Lieutenant Papoosha. He further alleges that Security Risk Group Coordinator and Security

Director Santiago were involved in the retaliatory conduct because they supervised Officers Martins and Grady.

Mr. Eckert also argues that his derogatory remarks about Officers Grady and Martins and Lieutenant Papoosha were protected speech, and that the tattoo on his forearm was protected expression.

The First Amendment protects not only speech, but also expressive conduct, as long as the conduct is "sufficiently imbued with elements of communication to fall within the scope" of the First Amendment. *Spence v. Washington,* 418 U.S. 405, 409 (1974). Mr. Eckert has not filed a photograph or otherwise described the tattoo on his forearm. Although Mr. Eckert submitted a copy of the disciplinary report issued to him by Officer Grady, the tattoo is not described and Mr. Eckert's alleged explanation of what the tattoo means has been redacted. *See* Ex. A— Disciplinary Report, ECF No. 13 at 3. Thus, Mr. Eckert has not alleged facts about the tattoo "sufficiently imbued with elements of communication to fall within the scope" of the First Amendment. *Id.*

Mr. Eckert has provided information about the derogatory and insulting statements made to and about Officers Grady and Martins and Lieutenant Papoosha on November 16, 2016. *See* Ex. C—Advocate Report, ECF No. 18. But courts within the Second Circuit have concluded that neither insults, nor abusive language, nor derogatory comments uttered by inmates constitute protected First Amendment speech. *See Baltas v. Erfe*, No. 3:19CV1820 (MPS), 2020 WL 1915017, at *20–21 (D. Conn. Apr. 20, 2020) (dismissing retaliation claim based on disciplinary report issued to inmate for using derogatory language towards a correctional nurse because insulting language is not protected speech); *Murray v. Arquitt*, No. 9:10-CV-1440 NAM/CFH,

2014 WL 4676569, at *19–20 (N.D.N.Y. Sept. 18, 2014) (inmate's allegation that correctional officer issued him a false disciplinary report because he had insulted officer did not state retaliation claim because "insults do not constitute protected speech"); *Chevalier v. Schmidt*, No. 11-CV-788, 2012 WL 6690313, at *3 (W.D.N.Y. Dec. 21, 2012) ("Vulgar, insulting, and threatening statements have been found not to be protected speech for purposes of the First Amendment.") (collecting cases); *Jackson v. Onondaga Cnty*, 549 F. Supp. 2d 204, 215 (N.D.N.Y. 2008) (holding that profane or threatening language in addressing corrections staff is not protected speech); *Doe v. Selsky*, 973 F. Supp. 2d 300, 304 (W.D.N.Y. Sept. 20, 2013) (concluding that "saying 'something nasty'" does not constitute protected speech) (citations omitted).

Thus, to the extent that it is based on his derogatory comments to Officers Grady and Martin and Lieutenant Papoosha, Mr. Eckert's First Amendment claim does not satisfy the first element of a retaliation claim.

Because Mr. Eckert has not asserted the facts necessary to meet all of the elements of a retaliation claim, the First Amendment clam against Officers Grady and Martins and against SRG Coordinator Aldi and Security Director Santiago, as their supervisors, will be dismissed under 28 U.S.C. § 1915A(b)(1).

### C.    Fourteenth Amendment Claims Regarding Administrative Actions

The Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. A Fourteenth Amendment due process claim can be either procedural or substantive.

### 1.    Procedural Due Process Claims Regarding the Disciplinary Report

12

"Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the . . . Fourteenth Amendment." *Matthews v. Eldridge*, 424 U.S. 319, 332 (1976). The analysis of a procedural due process claim generally "proceeds in two steps: We first ask whether there exists a liberty or property interest of which a person has been deprived, and if so we ask whether the procedures followed by the State were constitutionally sufficient." *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (per curiam). "Liberty interests protected by the Fourteenth Amendment may arise from two sources—the Due Process Clause itself and the laws of the States." *Hewitt v. Helms*, 459 U.S. 460, 466 (1983).

To succeed on a Section 1983 claim "for denial of due process arising out of a disciplinary hearing, a plaintiff must establish that he (1) possessed an actual liberty interest and (2) was deprived of that interest without being afforded sufficient process." *Williams v. Chuttey*, 767 F. App'x 105, 107 (2d Cir. 2019) (summary order) (citing *Ortiz v. McBride*, 380 F.3d 649, 654 (2d Cir. 2004)). The liberty interest must "subject the prisoner to 'atypical and significant hardship . . . in relation to the ordinary incidents of prison life.'" *Vega v. Lantz*, 596 F.3d 77, 83 (2d Cir. 2010) (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)). In the prison setting, liberty interests protected by due process "will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, . . . nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484. An inmate has a protected liberty interest only if the disciplinary sanctions caused him to suffer an "atypical and significant hardship" in comparison to "the ordinary

incidents of prison life." *Id.* at 486.

Lieutenant Richardson and Officers Grady and Martins allegedly deprived Mr. Eckert of a liberty interest by issuing a disciplinary ticket for Security Risk Group affiliation on November 16, 2016 and subsequently disposing of the disciplinary charge on December 9, 2016. Commissioner Semple, Director of Security Santiago, OCPM Director Miaga, Security Risk Group Coordinator Aldi, and Warden Black allegedly deprived him of a liberty interest by placing him in the Security Risk Group Program upon his readmission to the Department of Correction in December 2017, and again upon his readmission to the Department of Correction in January 2019.

Mr. Eckert further contends that Officers Grady and Martins deprived him of procedural due process in connection with the issuance of the disciplinary report for Security Risk Group affiliation and that Lieutenant Richardson deprived him of procedural due process during the resulting hearing. Mr. Eckert alleges that Lieutenant Richardson found him guilty of the charge and imposed sanctions, including the loss of telephone privileges, the loss of mail privileges, and the forfeiture of fifteen days of Risk Reduction Earned Credits. Am. Compl. at 10 ¶ 36.

The loss of Risk Reduction Earned Credits affects the duration of Mr. Eckert's confinement. *See Administrative Directive Chapter 4 Information and Records Management*, CONNECTICUT STATE DEPARTMENT OF CORRECTION, https://portal.ct.gov/-/media/DOC/Pdf/Ad/ad0402Apdf.pdf?la=en ("RREC could affect an inmate's discharge date by five (5) days a month if in compliance."). Because Mr. Eckert challenges sanctions affecting both the duration of his confinement and the conditions of his confinement, his due process claims relating to the issuance of the disciplinary report and disposition of the disciplinary charge

14

at a hearing are barred by the favorable termination rule set forth in *Heck v. Humphrey*, 512 U.S. 477 (1994).

Under *Heck*, a claim for money damages is not cognizable under 42 U.S.C. § 1983, if a decision in favor of the plaintiff would necessarily invalidate a criminal conviction unless that "conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal . . . , or called into question by a federal court's issuance of a writ of habeas corpus." 512 U.S. at 486–87 (citation omitted). This favorable termination rule extends to the loss of accumulated good-time credits. *Edwards v. Balisok*, 520 U.S. 651, 648 (1997). Thus, a prisoner may not proceed with a Section 1983 action challenging the imposition of a disciplinary sanction that affects the length of his or her sentence "unless he [or she] has shown that the sanction ... ha[s] been overturned through administrative channels or by a state or federal court." *Peralta v. Vasquez*, 467 F.3d 98, 100 (2d Cir. 2006).

"[A] prisoner subject to such mixed sanctions can proceed separately, under § 1983, with a challenge to the sanctions affecting his conditions of confinement without satisfying the favorable termination rule, *but . . . he can only do so if he is willing to forgo once and for all any challenge to any sanctions that affect the duration of his confinement.*" *Id.* at 104 (emphasis in the original).

Because Mr. Eckert has not demonstrated that the disposition of the disciplinary charge

has been invalidated, *Heck* bars the due process claims arising from the disposition of the

disciplinary charge unless Mr. Eckert "abandon[s], not just now, but also in any future

proceeding, any claims he may have with respect to the duration of his confinement that arise out

of the proceeding he is attacking in [this] § 1983 suit." *Id.* at 104.

Accordingly, Mr. Eckert must advise the Court in writing, by **July 10, 2020**, whether he

waives *for all time* all claims in this action relating to disciplinary sanctions affecting the

duration of his confinement (*i.e.*, the forfeiture of RREC) in order to proceed with his Fourteenth

Amendment procedural due process claims challenging the issuance of the disciplinary report by

Officers Grady and Martins for Security Risk Group affiliation and Lieutenant Richardson's

guilty finding on that charge.

### 2. Procedural Due Process Claims Regarding Readmission to SRG Program – December 2017 and January 2019

The Second Circuit has held that "*Sandin* does not apply to pretrial detainees." *Benjamin*

*v. Fraser*, 264 F.3d 175, 188–89 (2d Cir. 2001). Accordingly, a pretrial detainee need not prove

that the conditions under which he was confined exposed him to atypical and significant

hardships in order to demonstrate a liberty interest requiring procedural due process protection.

The nature of the restrictive confinement status dictates the type of process required. *See*

*id.* at 190. Administrative segregation is appropriate "when necessary to incapacitate an inmate

who "represents a security threat" or to "complet[e] . . . an investigation into misconduct

charges." *Hewitt*, 459 U.S. at 476. When being placed in administrative segregation, an inmate

"must merely receive some notice of the charges against him and an opportunity to present his

views [either orally or in writing] to the prison official charged with deciding whether to transfer

16

him to administrative segregation." *Id.*; *see also Wilkinson v. Austin*, 545 U.S. 209, 229 (2005)

(applying the standard set forth in *Hewitt* to a due process claim asserted by inmates who had

been classified for indefinite placement in a high security state prison for safety and security,

rather than disciplinary, reasons).

An inmate charged with a disciplinary violation in jeopardy of losing good-time credits is

entitled to the following: written notice of the charges at least twenty-four hours in advance of

the hearing; an opportunity to present witnesses and documentary evidence before an impartial

hearing officer or committee as long as doing so will not jeopardize prison safety and security;

and a written statement including evidence relied on by the hearing officer in reaching his or her

decision and the reasons for the disciplinary action. *Wolff v. McDonnell*, 418 U.S. 539, 564–66

(1973); *see also Almighty Supreme Born Allah v. Milling*, 876 F.3d 48, 55 n.3 (2d Cir. 2017)

("Procedural due process requires that a pretrial detainee be given 'written notice, adequate time

to prepare a defense, a written statement of the reasons for action taken, and a limited ability to

present witnesses and evidence' before being subjected to punitive as opposed to administrative

measures." (quoting *Benjamin*, 264 F.3d at 190)).

Commissioner Semple, Director of Security Santiago, OCPM Director Miaga, Security

Risk Group Coordinator Aldi, and Warden Black allegedly failed to provide Mr. Eckert with

procedural due process in connection with his automatic placement in Phase 3 of the Security

Risk Group Program after his readmissions to the Department of Correction on December 19,

2017 and after his readmission to the Department of Correction on January 22, 2019. Mr. Eckert

claims an entitlement to a 90-Review before his placement in the Security Risk Group Program

after both readmissions to custody in December 2017 and after his readmission to custody in

January 2019. Mr. Eckert has alleged being a pretrial detainee at the time of both readmissions.

Mr. Eckert alleges that confinement in the Security Risk Group Program resulted in punitive conditions during his confinement in Phase 3 as a pretrial detainee from January 2018 to March 2018 and from January 2019 to April 2019. Even if the confinement was administrative and not punitive or disciplinary, Mr. Eckert allegedly did not receive due process upon his readmissions to Phase 3 of the Security Risk Group Program in December 2017 or in January 2019.

Accordingly, Mr. Eckert has asserted sufficient facts to state a plausible Fourteenth Amendment procedural due process claim against Commissioner Semple, Director of Security Santiago, OCPM Director Miaga, Security Risk Group Coordinator Aldi, and Warden Black in their individual capacities and in their official capacities, to the extent that Mr. Eckert seeks injunctive relief.

### 3.   Substantive Due Process Claims Regarding Readmission to SRG Program, December 2017 and January

In evaluating whether a restrictive status or condition imposed on a pretrial detainee constitutes a violation of the detainee's substantive due process rights under the Fourteenth Amendment, "[a] court must decide whether the [restriction] is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." *Bell v. Wolfish*, 441 U.S. 520, 538 (1979).

To determine punitive intent in the absence of an allegation that the defendant clearly expressed an intent to punish a detainee, a court may consider "'whether an alternative purpose to which [the condition] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it].'" *Id.* (quoting *Kennedy v.*

*Mendoza–Martinez,* 372 U.S. 144, 168–69 (1963)). Thus, "if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.'" *Id.* at 539.

If, however, a restriction or condition is "arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees." *Id.* Valid governmental objectives for the imposition of restrictive conditions of confinement on pretrial detainees include "maintain[ing] security and order at the institution and mak[ing] certain no weapons or illicit drugs reach detainees," "ensuring a detainee's presence at trial," and "manag[ing] the facility in which the individual is detained." *Id.* at 540.

Commissioner Semple, OCPM Director Miaga, Security Risk Group Coordinator Aldi, Wardens Black and Corcella and Lieutenant Papoosha allegedly automatically placed Mr. Eckert in the Security Risk Group Program upon his readmission to custody in December 2017 and January 2019 arbitrarily and unrelated to a legitimate governmental purpose in violation of his Fourteenth Amendment substantive due process rights.

To satisfy the constitutional requirement of due process, and to ensure that administrative segregation is not punitive, individual assessments of an inmate's security risk is required. In *Almighty Supreme Born Allah*, for example, "in assigning Allah to Administrative Segregation in October 2010, prison officials made no individualized assessment whatsoever of the risk that Allah posed to institutional security." 876 F.3d at 57–58. "Instead, they placed Allah in Administrative Segregation solely on the basis of his prior assignment to (and failure to complete) the Administrative Segregation program during a prior term of incarceration,

consistent with their practice of doing so for any such inmate, unless he or she had nearly completed all three phases of the program or more than five years had elapsed since the inmate's prior term of incarceration." *Id.*

Here, prison officials allegedly placed Mr. Eckert in the Security Risk Group Program upon his readmission in December 2017 and upon his readmission in January 2019, without re-assessing his risk to Department of Correction staff or other inmates, solely because he had been placed in that Program during his prior periods of confinement but had not completed all phases of the Program before he discharged from those periods of confinement.

These allegations are sufficient to state a plausible substantive due process claim against Commissioner Semple, OCPM Director Miaga, Security Risk Group Coordinator Aldi, Wardens Black and Corcella and Lieutenant Papoosha in connection with Mr. Eckert's placement in the Security Risk Group Program in December 2017 and his placement in the SRG Program in January 2019. *See Almighty Supreme Born* Allah, 876 F.3d at 56 ("Although prison officials are to be afforded deference in matters of institutional security, such deference does not relieve officials from the requirements of due process or permit them to institute restrictive measures on pretrial detainees that are not reasonably related to legitimate governmental purposes.").

Accordingly, these substantive due process claims will proceed against Commissioner Semple, OCPM Director Miaga, Security Risk Group Coordinator Aldi, Wardens Black and Corcella and Lieutenant Papoosha in their individual and in their official capacities, to the extent that Mr. Eckert seeks injunctive relief.

### D. Fourteenth Amendment Substantive Due Process Claims Regarding Conditions of Confinement

"A pretrial detainee can establish a due process claim for inhumane conditions of

confinement by providing an official's deliberate indifference to those conditions, or by providing that those conditions are punitive." *Darnell v. Pineiro*, 849 F.3d 17, 34 n.12 (2d Cir. 2017) (citing *Fraser*, 343 F.3d at 50)).

### 1.    Deliberate Indifference

"A pretrial detainee may not be punished at all under the Fourteenth Amendment, whether . . . by deliberate indifference to conditions of confinement, or otherwise." *Darnell*, 849 F.3d at 35. Under the deliberate indifference standard, a pretrial detainee must satisfy both objective and subjective criteria.

First, the pretrial detainee must satisfy the "'objective prong' showing that the challenged conditions were sufficiently serious to constitute objective deprivations of the right to due process. . . . " *Id.* at 39. To establish an objective deprivation, "'the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his [or her] health,' which includes the risk of serious damage to 'physical and mental soundness.'" *Darnell*, 849 F.3d at 30 (citing *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013); *LaReau v. MacDougall*, 473 F.2d 974, 978 (2d Cir. 1972)). "There is no 'static test' to determine whether a deprivation is sufficiently serious; instead, 'the condition themselves must be evaluated in light of contemporary standards of decency.'" *Id.* The standards for evaluating objective deprivations depend on "severity and duration" and "not on the detainee's resulting injury." *Id.* In addition, the analysis should take place on a "case-by-case-basis," *id.* at 30, and "the conditions must be analyzed in combination, not in isolation, at least where one alleged deprivation has a bearing on another, *id.* at 32 ("[a]n overcrowded cell, for example, may exacerbate the effect of unsanitary conditions").

Second, the pretrial detainee must satisfy the "subjective prong" by showing that the officer acted with at least deliberate indifference to the challenged conditions." *Id.* at 30. "[T]o establish a claim for deliberate indifference to conditions of confinement under the Due Process Clause of the Fourteenth Amendment, the pretrial detainee must prove that the defendant-official acted intentionally to impose the alleged condition" or that the prison official "recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Id.* at 35.

Mr. Eckert describes various conditions in Phase 3 of the Security Risk Group Program at Corrigan as a pretrial detainee after his readmission at the end of December 2017 until his release in mid-March 2018, and again after his readmission at the end of January 2019 until his sentencing in early April 2019. Those conditions included: limited access to telephone calls; visits from family members; limitations on haircuts; restriction on mail in his cell; restrictions on recreation; and confinement to his cell twenty-three hours a day, including for meals. Am. Compl. at 10 ¶ 40; 12 ¶ 50. Mr. Eckert generally alleges not having the same access to the dayroom, the recreation yard, the gym, the library, work assignments, and educational and rehabilitative programs as the detainees and inmates in general population. *Id.* at 13 ¶ 54. Mr. Eckert alleges Commissioner Semple, OCPM Director Miaga, Security Risk Group Coordinator Aldi, Wardens Black and Corcella, and Lieutenant Papoosha were aware of or responsible for the conditions of his confinement at Corrigan in Phase 3 of the Security Risk Group Program upon his readmission as a pretrial detainee in December 2017 and in January 2019.

But Mr. Eckert "must show that the conditions, either alone or in combination, pose an

unreasonable risk of serious damage to his health." *Darnell*, 849 F.3d at 29. Mr. Eckert, however, has not alleged that any condition deprived him of a basic human need or necessity or exposed him to a risk of harm to his health or safety. *See Helling v. McKinney*, 509 U.S. 25, 32 (1993) (quoting *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 199–200 (1989) for the proposition basic human needs include food, clothing, shelter, medical care, and reasonable safety).Thus, he has not met the objective deprivation prong. *See Darnell*, 849 F.3d at 29 (To satisfy first prong of a Fourteenth Amendment conditions claim, detainee must show "that the challenged conditions were sufficiently serious to constitute objective deprivations of the right to due process." (internal quotation marks and citations omitted)); *Doyle v. Santiago*, No. 3:19-CV-901 (MPS), 2019 WL 5298147, at *8 (D. Conn. Oct. 18, 2019) ("Although the conditions described [in phases 2 and 3 of the SRG Program] may be harsh, they do not deprive the plaintiff of any basic human need and, therefore, are not unconstitutional."); *Pagan v. Dougherty*, No. 3:18-cv-1668 (VLB), 2019 WL 2616975 (D. Conn. June 26, 2019) (conditions in Security Risk Group Program including twenty-three-hour-a-day cell confinement and limitations on inmate's telephone use, visits from friends and family, eligibility for parole, access to educational and vocational services, and showers did not constitute deprivations that were serious enough to meet the objective prong of an Eighth Amendment claim) (collecting cases).

Because Mr. Eckert has not alleged that any Defendant subjected him to conditions that deprived him of a basic human need during his confinement at Corrigan as a pretrial detainee, he has not stated a plausible Fourteenth Amendment claim under the standard set forth in *Darnell*.

Accordingly, the Fourteenth Amendment substantive due process claims regarding conditions at Corrigan during Mr. Eckert's confinement in Phase 3 of the Security Risk Group

Program as a detainee from January 2018 to March 2018 and from January 2019 to April 2019 as asserted against Commissioner Semple, OCPM Director Miaga, Security Risk Group Coordinator Aldi, Wardens Black and Corcella, and Lieutenant Papoosha are dismissed. *See* 28 U.S.C. § 1915A(b)(1).

### 2.      Conditions as Punishment

The Supreme Court has held that pretrial detainees have a liberty interest in not being punished by the conditions of their pretrial confinement. *Bell*, 441 U.S. at 535 ("a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law"); *see also Benjamin*, 264 F.3d at 188 ("restrictions on pretrial detainees that implicate a liberty interest protected under the Due Process Clause may not 'amount to punishment of the detainee'").

In assessing whether state actions or restrictions on pretrial detainees comport with substantive due process, "[a] court must decide whether the [condition] is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." *Bell*, 441 U.S. at 538. Without a showing of an "expressed intent to punish on the part of detention facility officials, that determination generally will turn on 'whether an alternative purpose to which the restriction may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned to it.'" *Id.* Thus, "if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of governmental action is punishment that may not constitutionally be inflicted upon detainees qua detainees." *Id.* at 539.

Conversely, "if a particular condition or restriction of a pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to

24

'punishment.'" *Id.* Legitimate government objectives include "maintain[ing] security and order at the institution and mak[ing] certain no weapons or illicit drugs reach detainees," "ensuring a detainee's presence at trial," and "manag[ing] the facility in which the individual is detained." *Bell*, 441 U.S. at 540.

When determining whether a condition or restriction is punitive, courts examine the following factors:

> Whether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as punishment, whether it comes into play only on a finding of *scienter*, whether its operation will promote the traditional aims of punishment – retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned are all relevant to the inquiry. . . .

*Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168–69 (1963) (footnotes omitted); *see also Bell*, 441 U.S. at 537 ("[t]his Court has recognized a distinction between punitive measures that may not constitutionally be imposed prior to a determination of guilty and regulatory restraints that may").

In addition, courts must consider that "maintaining institutional security and preserving internal order and discipline are essential goals that may require limitations or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees." *Id.* at 546. "Prison officials must be free to take appropriate action to ensure the safety of inmates and corrections personnel and to prevent escape or unauthorized entry." *Id.* at 547.

Commissioner Semple, OCPM Director Miaga, Security Risk Group Coordinator Aldi, Wardens Black and Corcella, and Lieutenant Papoosha allegedly subjected Mr. Eckert to various

restrictive conditions of confinement during his confinement at Corrigan in Phase 3 of

the Security Risk Group Program, including conditions that, as a matter of law, are unrelated to a

legitimate safety or security goal or excessively harsh. *See Almighty Supreme Born Allah*, 876

F.3d at 57 ("[A] restrict[ion] related to a legitimate goal such as institutional security will still be

punitive if it is excessively harsh." (citing *Bell*, 441 U.S. at 538)); *see also* Am. Compl. at 9

¶¶39–40 (describing conditions of confinement to include three telephone calls per day,

visitation only with family members, limited access to mail, educational and rehabilitative

programming, and confinement in cell twenty-three hours a day).

Mr. Eckert thus has plausibly alleged that the conditions related to his confinement in his

cell for twenty-three hours a day and the restrictions on telephone calls, visitation, and mail

retention were sufficiently harsh and/or unrelated to legitimate safety or security concern to

constitute punishment.

Accordingly, Mr. Eckert's claims against Commissioner Semple, OCPM Director

Miaga, Security Risk Group Coordinator Aldi, Wardens Black and Corcella and Lieutenant

Papoosha for allegedly imposing punitive conditions of confinement on him from January 2018

to March 2018 and from January 2019 to April 2019, in violation of his right to substantive due

process under the Fourteenth Amendment, will proceed against these Defendants in their

individual capacities and in their official capacities, to the extent that Mr. Eckert seeks injunctive

relief.

### G.  Eighth Amendment Claims Regarding Conditions of Confinement

"It is undisputed that the treatment a prisoner receives in prison and the conditions under

which he is confined are subject to scrutiny under the Eighth Amendment." *Helling*, 509 U.S. at

31; *see id.* at 32 (defining basic human needs as "food, clothing shelter, medical care, and reasonable safety" (quoting *DeShaney v. Winnegabo Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989)). Only those conditions that deprive an inmate of the "minimal civilized measure of life's necessities" are sufficiently serious to form the basis of an Eighth Amendment claim. *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).

For having been placed in the Security Risk Group Program at Corrigan in December 2017 to January 2017 and from April 2, 2019 until October 2019, Mr. Eckert alleges that Commissioner Semple, OCPM Director Miaga, Security Risk Group Coordinator Aldi, Warden Corcella, and Lieutenant Papoosha subjected him to restrictive conditions in violation of the Eighth Amendment.

As a preliminary matter, Mr. Eckert describes Lieutenant Papoosha as having worked at Bridgeport Correctional Center. *See* Am. Compl. at 3 ¶ 9. There are no facts to suggest that Lieutenant Papoosha, as an employee at Bridgeport Correctional Center, subjected Mr. Eckert to unconstitutional conditions of confinement at Corrigan from either December 2016 to January 2017 or from April 2019 to October 2019. The Eighth Amendment claim asserted against Lieutenant Papoosha thus will be dismissed. *See* 28 U.S.C. § 1915A(b)(1).

Mr. Eckert describes the conditions in Phase 3 of the Security Risk Group Program as: three fifteen-minute telephone calls a day, two fifteen-minute telephone calls with his attorney or the court per day, a one-hour visit from a family member each week, five pieces of mail in his cell at one time, one haircut each month, one hour of recreation each day, confinement in his cell twenty-three hours each day, including all meals, and occasional searches of his cell due to the misbehavior of other inmates in the housing unit. These conditions did not deprive Mr. Eckert of

basic human needs or expose him to a risk of harm to his health or safety during his confinement in the Security Risk Group Program. Thus, he has not alleged facts sufficient to satisfy the objective prong of the Eighth Amendment standard.

Mr. Eckert allegedly had been assaulted by a member of the Aryan Brotherhood gang. But Mr. Eckert has not alleged any injuries as a result of this altercation or that any Defendant was aware of the altercation or that any Defendant acted with deliberate indifference and thus, caused this assault. Consequently, Mr. Eckert has not alleged that any Defendant was deliberately indifferent to a substantial risk or harm to his health or safety.

Accordingly, The Eighth Amendment claims pertaining to his confinement in the Security Risk Group Program at Corrigan from December 27, 2017 to January 20, 2017 and from April 2, 2019 until October 2019 asserted against Commissioner Semple, OCPM Director Miaga, Security Risk Group Coordinator Aldi, and Warden Corcella therefore will be dismissed under 28 U.S.C. § 1915A(b)(1).

**ORDERS**

The Court enters the following orders:

The request for compensatory and punitive damages for violations of Mr. Eckert's federal constitutional rights by Defendants in their official capacities is **DISMISSED** under 28 U.S.C. § 1915A(b)(2).

The request for declaratory relief; the First Amendment retaliation claim asserted against Officers Grady and Martins, Security Risk Group Coordinator Aldi, and Security Director Santiago; the Fourteenth Amendment substantive due process claim asserted against Commissioner Semple, OCPM Director Miaga, Security Risk Group Coordinator Aldi, Wardens

Black and Corcella, and Lieutenant Papoosha for allegedly subjecting Mr. Eckert to inhumane conditions in Phase 3 of the Security Risk Group Program at Corrigan-Radgowski as a detainee from January 2018 to March 2018 and from January 2019 to April 2019; and the Eighth Amendment claim asserted against Commissioner Semple, OCPM Director Miaga, Security Risk Group Coordinator Aldi, Warden Corcella, and Lieutenant Papoosha for allegedly subjecting Mr. Eckert to unconstitutional conditions during his confinement in the Security Risk Group Program at Corrigan-Radgowski from December 27, 2017 to January 20, 2017 and from April 2, 2019 to October 2019 are all **DISMISSED** under 28 U.S.C. § 1915A(b)(1).

(1)　　By **July 10, 2020**, Mr. Eckert shall advise the Court in a written Notice whether he waives *for all time* all claims in this action relating to disciplinary sanctions affecting the duration of his confinement (*i.e.*, the forfeiture of Risk Reduction Earned Credit) in order to proceed with the Fourteenth Amendment procedural due process claims challenging the issuance of the disciplinary report by Officers Grady and Martins for Security Risk Group affiliation on November 16, 2016 and Lieutenant Richardson's finding that he was guilty of that charge on December 9, 2016. If Mr. Eckert chooses not to file the Notice within the time specified, the Court will dismiss without prejudice the Fourteenth Amendment procedural due process claims against Officers Grady and Martins and Lieutenant Richardson pertaining to the issuance and disposition of the November 16, 2016 disciplinary report for Security Risk Group affiliation.

(2) The Fourteenth Amendment substantive due process claim related to Mr. Eckert's automatic placement in the Security Risk Group Program in December 2017 and his automatic placement in the Security Risk Group Program in January 2019 will proceed against Commissioner Semple, OCPM Director Miaga, Security Risk Group Coordinator Aldi, Wardens

Black and Corcella, and Lieutenant Papoosha in their individual and official capacities, to the extent that Mr. Eckert seeks injunctive relief; the Fourteenth Amendment substantive due process claim related to the imposition of punitive conditions of confinement on Mr. Eckert from January 2018 to March 2018 and from January 2019 to April 2019 will proceed against Commissioner Semple, OCPM Director Miaga, Security Risk Group Coordinator Aldi, Wardens Black and Corcella, and Lieutenant Papoosha in their individual and official capacities, to the extent that Mr. Eckert seeks injunctive relief; and the Fourteenth Amendment procedural due process claim related to Mr. Eckert's placement in Phase 3 of the Security Risk Group Program upon his readmission to the Department of Correction in December 2017 and his placement in Phase 3 of the Security Risk Group Program upon his readmission to the Department of Correction in January 2019 will proceed against Commissioner Semple, Director of Security Santiago, OCPM Director Miaga, Security Risk Group Coordinator Aldi, and Warden Black in their individual and official capacities, to the extent that Mr. Eckert seeks injunctive relief.

   **(3)**      By **July 10, 2020**, the Clerk shall prepare a summons form and send an official capacity service packet to the U.S. Marshal's Service. The U.S. Marshals Service shall serve the summons, a copy of the amended complaint and this order on Commissioner Scott Semple, Director of Security Antonio Santiago, Office of Classification and Population Management Director David Miaga, Security Risk Group Coordinator John Aldi, Warden Allison Black, Warden Corcella, and Lieutenant Papoosha in their official capacities by delivering the necessary documents in person to the Office of the Attorney General, 55 Elm Street, Hartford, CT 06141.

   **(4)**      By **July 10, 2020, t**he Clerk shall verify the current work addresses of: Commissioner Scott Semple, Director of Security Antonio Santiago, Office of Classification and

Population Management Director David Miaga, Security Risk Group Coordinator John Aldi, Warden Allison Black, Warden Corcella, and Lieutenant Papoosha and mail a copy of the amended complaint, this order, and a waiver of service of process request packet to each defendant in his or her individual capacity at his or her confirmed address.

By **August 21, 2020**, the Clerk shall report to the Court on the status of each request. If any defendant fails to return the waiver request, the Clerk shall arrange for in-person service by the U.S. Marshals Service and that defendant shall be required to pay the costs of such service in accordance with Federal Rule of Civil Procedure 4(d).

**(5)** Defendants Semple, Aldi, Santiago, Miaga, Black, Corcella, and Papoosha shall file their response to the amended complaint, either an Answer or motion to dismiss, by **October 23, 2020**. If the Defendants choose to file an Answer, they shall admit or deny the allegations and respond to the cognizable claims recited above. They may also include all additional defenses permitted by the Federal Rules.

**(6)** Discovery, under Federal Rules of Civil Procedure 26 through 37, shall be completed by **January 15, 2021**. Discovery requests need not be filed with the Court.

**(7)** All motions for summary judgment shall be filed by **February 19, 2021**.

**(8)** The Clerk shall send a copy of the Amended Complaint and this order to the Connecticut Attorney General and to the Department of Correction Legal Affairs Unit.

**(9)** The parties must comply with the District of Connecticut "Standing Order Re: Initial Discovery Disclosures" which will be sent to the parties by the Clerk. The order also can be found at http://ctd.uscourts.gov/district-connecticut-public-standing-orders.

**SO ORDERED** at Bridgeport, Connecticut this 12th day of June, 2020.

_____
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE